1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10
                            ----oo0oo----
11

12   JOSE ONTIVEROS,                    CIV. NO. 2:08-567 WBS DAD

13              Plaintiff,              MEMORANDUM AND ORDER RE: MOTION
                                        FOR PRELIMINARY SETTLEMENT
14        v.                            APPROVAL

15   ROBERT ZAMORA; ZAMORA
     AUTOMOTIVE GROUP; STOCKTON
16   AUTO CARS, INC., dba Stockton
     Honda & Stockton Mazda; AUTO
17   TOWN, INC., dba Toyota Town &
     Stockton Scion; HAMMER LANE
18   VOLKSWAGEN, INC.; QUALITY
     MOTOR CARS OF STOCKTON, dba
19   Acura of Stockton, Go
     Hyundai, & Kia of Stockton;
20   SATURN OF STOCKTON, dba
     Saturn of Modesto; LODI
21   MOTORS INC., dba Lodi Honda;
     MERCED AUTO CARS, INC., dba
22   Merced Toyota & Merced Scion;
     CLOVIS AUTO CARS, INC., dba
23   Clovis Volkswagen; and
     COUNTRY NISSAN, dba Nissan
24   Kia Country,

25              Defendants.

26
                            ----oo0oo----
27

28           Plaintiff Jose Ontiveros brought this wage-and-hour

                                   1

1 action on behalf of himself and a putative class of similarly

2 situated service technicians at automotive dealerships affiliated

3 with defendant Zamora Automotive Group ("ZAG"), which operates

4 numerous automotive dealerships located throughout the San

5 Joaquin Valley.  Over six years after the litigation commenced,

6 the parties agreed to settle the action on a class-wide basis.

7 Plaintiff now moves for preliminary approval of that settlement

8 pursuant to Federal Rule of Civil Procedure 23(e).

9 I.   Factual and Procedural History

10        Plaintiff worked at Stockton Honda, a ZAG-affiliated

11 dealership, for seven months in 2007.  (Ontiveros Decl. ¶ 2

12 (Docket No. 75-6).)  Plaintiff alleges that he and other

13 technicians employed at ZAG-affiliated dealerships were paid

14 using a piece rate scheme that failed to compensate employees for

15 the actual time they worked.  (Id. ¶ 4; see also Feb. 20, 2009

16 Order re: Mot. for J. on Pleadings at 5 ("Although not pled in

17 detail in plaintiff's complaint, plaintiff and defendants both

18 agree that the corporate defendants used a 'flag rate' or 'piece

19 rate' compensation system for the automobile mechanics they

20 employed.") (Docket No. 29).)

21        In his Second Amended Complaint, plaintiff alleges that

22 defendants' compensation practices violated both federal and

23 state wage-and-hour statutes and asserts ten claims under

24 California law.[1]  While plaintiff does not assert a claim under

---

25        [1]     Those claims include: (1) unlawful business practices
   under California Business & Professions Code sections 17200 et
26 seq. based on violations of the Fair Labor Standards Act
   ("FLSA"), 29 U.S.C. §§ 201 et seq.; (2) failure to pay overtime
27 wages under section 1194(a) of the California Labor Code; (3)
   failure to pay minimum wage under section 1194(a) of the
28

the FLSA, he does assert that defendants' failure to comply with the FLSA constitutes an unlawful business practice under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq.

This action was previously assigned to another district judge.  Prior to reassignment, the court denied in part defendants' motion for judgment on the pleadings and held that plaintiff had stated plausible claims that defendants' compensation practices were unlawful.  (Docket No. 29.)  The court stayed the case in 2010 pending the resolution of a related insurance-coverage case in state court and subsequently lifted that stay on July 26, 2012.  (Docket Nos. 51, 58, 64.)  In December 2012, plaintiff moved for class certification and defendants moved to compel individual arbitration of plaintiff's claims.  (Docket Nos. 72-73.)  The court denied defendants' motion to compel arbitration, and defendants timely appealed. (Docket Nos. 104-105.)  The court once again stayed the case pending the outcome of that appeal.  (Docket No. 118.)

Before the Ninth Circuit could resolve defendants'

---

California Labor Code; (4) failure to provide rest periods under section 1194(a) of the California Labor Code; (5) unlawful kickback payments in violation of California Labor Code sections 221-223; (6) failure to pay timely wages due at termination in violation of California Labor Code sections 201-203; (7) failure to provide accurate employee wage statements in violation of sections 1174 and 1175 of the California Labor Code; (8) failure to pay reporting time wages in violation of California Labor Code section 1197; (9) unlawful and unfair business practices under California Business & Professions Code sections 17200 et seq. based on violations of the California Labor Code.  In addition, plaintiff asserts a claim on his own behalf under the California Private Attorney General Act, Cal. Labor Code §§ 2698 et seq. (SAC ¶¶ 41-118 (Docket No. 18).)

1  appeal, the parties reached a settlement.  (Mallison Decl. ¶¶ 30-

2  36 (Docket No. 123-2); Mallison Decl. Ex. 1 ("Settlement

3  Agreement") (Docket No. 123-3).)  The settlement requires

4  defendants to pay $2,000,000 to plaintiff and a class of

5  similarly situated ZAG service technicians.  (Id. ¶ 31.)  After

6  accounting for attorney's fees, civil penalties, taxes, a $20,000

7  incentive award to plaintiff, and other administrative expenses,

8  the remainder of the settlement funds will be divided between the

9  class members in proportion to the number of weeks worked during

10  the class period.  (Id. ¶ 31-32.)  Any unclaimed settlement funds

11  will be redistributed to class members on a pro rata basis; if

12  there are funds left over after that point, the funds are to be

13  redistributed to designated cy pres beneficiaries.  (Settlement

14  Agreement § III, ¶ E.)  No portion of the settlement fund will

15  revert to defendants.  (Id.)

16       After the parties reached this settlement, plaintiff

17  moved for preliminary approval of the settlement and conditional

18  certification of a class of current and former service

19  technicians pursuant to Federal Rule of Civil Procedure 23.

20  (Docket No. 123.)  The previously-assigned district judge recused

21  himself on June 25, 2014, and the action was subsequently

22  reassigned to the undersigned district judge for all further

23  proceedings.  (Docket No. 125.)

24  II.  Discussion

25       Judicial policy strongly favors settlement of class

26  actions.  Class Plaintiffs v. City of Seattle, 955 F.2d 1268,

27  1276 (9th Cir. 1992).  "To vindicate the settlement of such

28  serious claims, however, judges have the responsibility of

1  ensuring fairness to all members of the class presented for

2  certification." Staton v. Boeing Co., 327 F.3d 938, 952 (9th

3  Cir. 2003). Where the "parties reach a settlement agreement

4  prior to class certification, courts must peruse the proposed

5  compromise to ratify both [1] the propriety of the certification

6  and [2] the fairness of the settlement." Id.

7        The approval of a class action settlement takes place

8  in two stages. In the first stage of the approval process, the

9  court preliminarily approves the settlement pending a fairness

10  hearing, temporarily certifies a settlement class, and authorizes

11  notice to the class. See Murillo v. Pac. Gas & Elec. Co., 266

12  F.R.D. 468, 473 (E.D. Cal. 2010). In this Order, therefore, "the

13  court will only determine whether the proposed class action

14  settlement deserves preliminary approval and lay the ground work

15  for a future fairness hearing." Id. (citing Nat'l Rural

16  Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 525 (C.D. Cal.

17  2004) (alterations and internal quotation marks omitted).

18        "Once the judge is satisfied as to the certifiability

19  of the class and the results of the initial inquiry into the

20  fairness, reasonableness, and adequacy of the settlement, notice

21  of a formal Rule 23(e) fairness hearing is given to the class

22  members." Manual for Complex Litigation, Fourth, § 21.633

23  (2004). At the hearing, the court will entertain class members'

24  objections to (1) the treatment of this litigation as a class

25  action and/or (2) the terms of the settlement. See Murillo, 266

26  F.R.D. at 473. Following the fairness hearing, the court will

27  reach a final determination as to whether the parties should be

28  allowed to settle the class action pursuant to the terms agreed

5

1  upon.  See DIRECTV, 221 F.R.D. at 525.

2       A.   Use of Opt-Out Class

3            In lieu of a claim under the FLSA, 29 U.S.C. §§ 201 et

4  seq., plaintiff uses defendants' alleged violations of the FLSA

5  as the predicate for a claim under the UCL.  (See SAC ¶¶ 41-49.)

6  The UCL permits courts to certify a class of plaintiffs alleging

7  wage-and-hour violations as an "opt-out" class.  See Sav-On Drug

8  Stores, Inc. v. Superior Court, 34 Cal. 4th 319, 340 (2004).

9            In contrast to the UCL, the FLSA requires that parties

10 to a "collective action" must affirmatively "opt-in" to the suit.

11 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to

12 any such action unless he gives his consent in writing to become

13 such a party and such consent is filed in the court where such

14 action is brought."); Murillo, 266 F.R.D. at 470 ("The FLSA

15 limits participation in a collective action to only parties who

16 'opt-in' to the suit.").  And while the Ninth Circuit has held

17 that the FLSA "does not preempt a state-law § 17200 claim that

18 'borrows' its substantive standard from FLSA," it has not

19 explicitly held that a court may certify an opt-out class of

20 plaintiffs asserting such a claim.  Wang v. Chinese Daily News,

21 Inc., 623 F.3d 743, 760 (9th Cir. 2010), vacated on other

22 grounds, 132 S.Ct. 74 (2011); see also In re Wells Fargo Home

23 Mortg. Overtime Pay Litig., 571 F.3d 953, 959 n.5 (9th Cir. 2009)

24 (declining to "explore the question" of whether a plaintiff may

25 bring a state law opt-out class action based on failure to pay

26 overtime pay if that plaintiff does not assert an FLSA claim).

27            However, numerous district court decisions suggest that

28 the FLSA does not bar certification of an opt-out UCL class

1   predicated on FLSA violations.  For instance, in Tomlinson v.

2   Indymac Bank, F.S.B., the defendant argued that certification of

3   an opt-out UCL class alleging wage-and-hour violations would

4   circumvent the FLSA's statutory prohibition on opt-out classes.

5   359 F. Supp. 2d 898, 899 (C.D. Cal. 2005).  The court held

6   otherwise: it characterized the FLSA's opt-in requirement as

7   "merely a procedural hurdle," and held that a "claim under the

8   UCL . . . is not precluded simply because it is procedurally

9   barred by the underlying statute."  Id. at 900.  It reasoned that

10  because the UCL makes violations of other wage-and-hour statutes

11  independently actionable, a plaintiff need only satisfy the UCL's

12  procedural requirements in order to assert class-wide UCL claims

13  on an opt-out basis.  Id.

14          In Bahramipour v. Citigroup Global Markets, Inc., the

15  court likewise held that the FLSA did not foreclose the use of an

16  opt-out UCL class.  Civ. No. 04-4440 CW, 2006 WL 449132, at *6

17  (N.D. Cal. Feb. 22, 2006).  Although the court acknowledged that

18  there were "procedural differences between the FLSA and the UCL,"

19  it nonetheless held that the use of an opt-out class was

20  appropriate because the plaintiff did not bring a freestanding

21  FLSA claim and was therefore not bound by its procedural

22  requirements.  Id. at *3.  While the defendant argued that the

23  use of an opt-out class undermined the FLSA's policy of shielding

24  employers from the "enormous liability" of facing "thousands of

25  federal wage and hour claims," the court held that this concern

26  was inapplicable because damages under the UCL are limited to

27  restitution.  Id. at *5.

28          As in Tomlinson and Bahramipour, the FLSA does not bar

1  certification of plaintiff's proposed opt-out class.  Those

2  decisions and others make clear that the UCL's procedural

3  requirements, not the FLSA's, govern whether a plaintiff may seek

4  to certify an opt-out UCL class even if the class's claims are

5  substantively predicated on the FLSA.  See id. at *3; Tomlinson,

6  359 F. Supp. 2d at 900; see also, e.g., Takacs v. A.G. Edwards &

7  Sons, Inc., 444 F. Supp. 2d 1100, 1118 (S.D. Cal. 2006)

8  (permitting plaintiff to certify an opt-out class asserting UCL

9  claims based on FLSA violations).

10       Moreover, "the FLSA indicates that it does not preempt

11  state law claims for wage violations."  Thorpe v. Abbott Labs.,

12  Inc., 534 F. Supp. 2d 1120, 1124 (N.D. Cal. 2008) (citing 29

13  U.S.C. § 218(a)); accord Murillo, 266 F.R.D. at 472 ("Had

14  Congress believed that allowing a state opt-out action to go

15  forward . . . would undermine the statute, it would not have

16  expressly indicated that the FLSA does not preempt state labor

17  laws.").  To the extent that the UCL serves to vindicate the

18  interests of plaintiffs who are paid an unlawful wage, the use of

19  opt-out class actions is a critical part of the statutory scheme

20  that the California legislature designed to protect those

21  interests.  See Bahramipour, 2006 WL 449132, at *7 ("By allowing

22  'opt-out' class actions and a longer statute of limitations for

23  UCL claims, California provides increased protections for its

24  workers . . . .");  Campbell v. PricewaterhouseCoopers, Civ. No.

25  2:06-2376 LKK GGH, 2008 WL 3836972, at *9 (E.D. Cal. Aug. 14,

26  2008) (same); cf. Harris v. Vector Mktg. Corp., 753 F. Supp. 2d

27  996, 1018 (N.D. Cal. 2010) (describing procedural differences

28  between the FLSA and Rule 23 and their effect on a plaintiff's

1   ability to vindicate rights created by state law).  Barring an

2   opt-out UCL class action "would in practical terms have a

3   preemptive effect" on that claim and is therefore inconsistent

4   with the FLSA's savings clause.  Harris, 753 F. Supp. 2d at 1018.

5          This conclusion accords not only with precedent and the

6   FLSA's savings clause, but also with ordinary conflict preemption

7   principles.[2]  As the Supreme Court has made clear, "state causes

8   of action are not preempted solely because they impose liability

9   over and above that authorized by federal law."  English v. Gen.

10  Elec. Co., 496 U.S. 72, 90 (1990).  Rather, state law is

11  preempted only "where it is impossible to comply with both state

12  and federal requirements" or "where state law stands as an

13  obstacle to the accomplishment and execution of the full purposes

14  and objectives of Congress."  Williamson v. Gen. Dynamics Corp.,

15  208 F.3d 1144, 1152 (9th Cir. 2000).  Because courts "presume[]

16  that Congress does not cavalierly pre-empt state-law causes of

17  action," preemption analysis "start[s] with the assumption that

18  the historic police powers of the States were not to be

19  superseded . . . unless that was the clear and manifest purpose

20  of Congress."  Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)

21  (citation and internal quotation marks omitted).

22         No such conflict exists here.  It is not impossible for

23  defendants to comply with both the FLSA and the UCL.  In fact,

24  insofar as plaintiff's UCL claim is predicated on violations of

25

26         [2]   Although the Ninth Circuit declined to decide whether a
    plaintiff may maintain an opt-out class alleging a UCL claim
27  predicated on FLSA violations, it explicitly characterized this
    issue as a "question of preemption."  In re Wells Fargo, 571 F.3d
28  at 959 n.5.

                                      9

1   the FLSA, it incorporates exactly the same substantive standards

2   that are supplied by federal law.  See id. at 495 (holding that

3   the presence of additional remedies under state law does not give

4   rise to conflict preemption when those remedies "merely provide[]

5   another reason . . . to comply with identical existing

6   'requirements' under federal law").

7         Nor does the use of an opt-out UCL class conflict with

8   the animating purposes and objectives of the FLSA.  Both "the

9   Supreme Court and the Ninth Circuit have consistently found that

10  the central purpose of the FLSA is to enact minimum wage and

11  maximum hour provisions designed to protect employees."

12  Williamson, 208 F.3d at 1154 (citations omitted).  As explained

13  earlier, permitting opt-out class actions is part of a statutory

14  scheme that is designed to afford greater protection to workers

15  than the FLSA affords alone.  See Bahramipour, 2006 WL 449132, at

16  *7.  And even if the FLSA's opt-in requirement intended to

17  "protect employers as well as employees," permitting plaintiffs

18  to bring opt-out UCL claims--for which the only remedies are

19  restitution or injunctive relief--would not expose employers to

20  ruinous liability and thereby "upset the careful balance

21  established by the statute."  Williamson, 208 F.3d at 1153-54.

22  Accordingly, the court will permit plaintiff to seek

23  certification of an opt-out class.

24        B.   Class Certification

25         "To be certified, the putative class . . . must meet

26  the four threshold requirements of Federal Rule of Civil

27  Procedure 23(a): numerosity, commonality, typicality, and

28  adequacy of representation.  Moreover, the proposed class must

satisfy the requirements of Rule 23(b), which defines three different types of classes." Leyva v. Medline Indus. Inc., 716 F.3d 510, 512 (9th Cir. 2013) (citations omitted).  These requirements "demand undiluted, even heightened attention in the settlement context . . . for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 620 (1997).

> 1.   Rule 23(a)

Rule 23(a) restricts class actions to cases where:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These requirements are more commonly known as numerosity, commonality, typicality, and adequacy of representation, respectively. Leyva, 716 F.3d at 512.  While the court must evaluate Rule 23(a)'s requirements independently, they serve a common purpose of "ensur[ing] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541, 2550 (2011).

> a.   Numerosity

While Rule 23(a) requires that the class be "so numerous that joinder of all members is impracticable," Fed. R. Civ. P. 23(a)(1), it does not require "that the class must be so

1  numerous that joinder is impossible," Arnold v. United Artists

2  Theatre Circuit, Inc., 158 F.R.D 439, 448 (N.D. Cal. 1994).  "A

3  proposed class of at least forty members presumptively satisfies

4  the numerosity requirement."  Avilez v. Pinkerton Gov't Servs.,

5  286 F.R.D. 450, 456 (C.D. Cal. 2012); see also, e.g., Collins v.

6  Cargill Meat Solutions Corp., 274 F.R.D. 294, 300 (E.D. Cal.

7  2011) (Wanger, J.) ("Courts have routinely found the numerosity

8  requirement satisfied when the class comprises 40 or more

9  members.").  The proposed class, which comprises approximately

10  two hundred service technicians, easily satisfies this

11  requirement.  See Collins, 274 F.R.D. at 300 (conditionally

12  certifying a class of 219 employees); Lymburner v. U.S. Fin.

13  Funds, Inc., 263 F.R.D. 534, 539 (N.D. Cal. 2010) (certifying a

14  class of 121 plaintiffs).

15                    b.   Commonality

16         Rule 23(a) also requires the existence of "questions of

17  law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  It

18  is not sufficient to show that the class members' allegations

19  raise literally any common question; rather, commonality requires

20  that the class members' claims "depend upon a common contention"

21  that is "capable of classwide resolution--which means that

22  determination of its truth or falsity will resolve an issue that

23  is central to the validity of each one of the claims in one

24  stroke."  Dukes, 131 S.Ct. at 2551.  But "all questions of fact

25  and law need not be common to satisfy the rule," and the

26  "existence of shared legal issues with divergent factual

27  predicates is sufficient, as is a common core of salient facts

28  coupled with disparate legal remedies within the class."  Hanlon

12

1   v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).

2           Generally, "the fact that an employee challenges a

3   policy common to the class as a whole creates a common question

4   whose answer is apt to drive the resolution of the litigation."[3]

5   Pryor v. Aerotek Scientific, LLC, 278 F.R.D. 516, 525 (C.D. Cal.

6   2011).  Here, plaintiff indicates that ZAG-affiliated automotive

7   dealerships had a common policy of paying service technicians on

8   a flat-rate, piece-work basis and alleges that this policy

9   violated state and federal wage-and-hour laws.  In his brief in

10  support of his motion for class certification filed prior to

11  settlement, plaintiff identified numerous common questions

12  arising out of these allegations:

13      a. Whether Zamora's flat-rate policy failed to pay for
        all time worked as recorded in Zamora's timekeeping
14      system;

15      b. Whether Zamora's flat-rate policy properly failed
        to pay for rest breaks[;]
16

17      c. Whether Zamora's flat-rate policy properly failed
        to pay for employee meetings;

18      d. Whether Zamora's flat-rate policy properly failed
        to pay for cleaning time;
19

20      e. Whether Zamora's flat-rate policy properly failed
        to pay for waiting time;

21          [3]   As the Supreme Court made clear in Dukes, the existence

22  of a common employment or wage policy is not always sufficient to
    satisfy the commonality requirement.  See 131 S.Ct. at 2557.

23  There, the Court held that a company-wide policy that committed
    discretion over employment decisions to individual store managers

24  did not give rise to common issues of law or fact because
    plaintiffs had "not identified a common mode of exercising

25  discretion that pervades the entire company."  Id. at 2554-55.
    But there is no indication that the piece rate policy at issue in

26  this case was implemented at the discretion of individual
    dealerships, and the existence of a company-wide policy of piece

27  rate compensation therefore presents common issues of law or

28  fact.

                                    13

1    f. Whether Zamora's flat-rate policy properly failed
2    to pay for completing administrative tasks;

     g. Whether Zamora's flat-rate policy properly failed
3    to pay for diagnostic tasks;

4    h. Whether Zamora's flat-rate policy properly failed
     to pay for free services to customers;
5
     i. Whether Zamora's flat-rate policy properly failed
6    to pay for assisting or training junior mechanics;

7    j. Whether Zamora's flat-rate policy properly failed
     to pay for conducting opening or closing tasks;
8
     k.   Whether   Zamora's   flat-rate   policy   violated
9    California  minimum  wage  and  overtime  requirements,
     rest period requirements, wage statement requirements,
10   timely  payment  of  wage  requirements,  the  Unfair
     [C]ompetition [L]aw and/or the California Labor Code
11   Private Attorney General Act.

12   (Docket No. 76.)

13          Whether class members were subject to a policy of

14   piece-work compensation, whether that policy was uniformly

15   applied at ZAG-affiliated dealerships, and whether that policy

16   was unlawful are common questions of law and fact that satisfy

17   Rule 23(a)(2).  See Pryor, 278 F.R.D. at 525; see also, e.g.,

18   Stiller v. Costco Wholesale Corp., --- F.R.D. ---, Civ. No. 3:09-

19   2473 GPC BGS, 2014 WL 1455440, at *13 (S.D. Cal. Apr. 15, 2014)

20   (holding that whether Costco had a policy of requiring employees

21   to perform unpaid labor after closing, whether that policy was

22   enforced on a company-wide basis, and whether Costco exercised

23   control over employees during that time were common questions);

24   Dilts v. Penske Logistics, LLC, 267 F.R.D. 625, 627 (S.D. Cal.

25   2010) (finding commonality when plaintiffs provided evidence that

26   "the relevant policies were common across Defendant's California

27   facilities"); Wren v. RGIS Inventory Specialists, 256 F.R.D. 180,

28   205 (N.D. Cal. 2009) (finding commonality where plaintiff

                                    14

1  proffered evidence of a company-wide policy regarding donning and

2  waiting time).

3        Plaintiff's claims not only implicate common questions

4  of law and fact, but are also amenable to common methods of

5  proof.  In particular, the court could examine defendants' pay

6  records to reconstruct the hours that class members worked and

7  determine if their pay complied with applicable wage-and-hour

8  laws.  Several courts have held that the ability to resolve

9  class-wide wage-and-hour claims by looking at the "wage

10 statements themselves" militates in favor of finding commonality.

11 Avilez, 286 F.R.D. at 465; see also, e.g., McKenzie v. Fed.

12 Express Corp., 275 F.R.D. 290, 296 (C.D. Cal. 2011).

13        Accordingly, because plaintiff has shown that the

14 class's claims implicate common issues of law and fact and are

15 susceptible to common methods of proof, the putative class

16 satisfies the commonality requirement.

17              c.   Typicality

18        Rule 23(a) further requires that the "claims or

19 defenses of the representative parties [be] typical of the claims

20 or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  This

21 requires only that the named plaintiff's claims are "reasonably

22 coextensive with those of absent class members" and does not

23 mandate a showing that his claims are "substantially identical"

24 to theirs.  Hanlon, 150 F.3d at 1020.  In other words, the test

25 for typicality "is whether other members have the same or similar

26 injury, whether the action is based on conduct which is not

27 unique to the named plaintiffs, and whether other class members

28 have been injured by the same course of conduct."  Hanon v.

1  Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992) (citation

2  and internal quotation marks omitted).

3      Here, plaintiff alleges that he suffered essentially

4  the same injury as other service technicians employed at ZAG-

5  affiliated dealerships--namely, that his employer calculated his

6  pay using a fixed-rate, piece-work system that unlawfully failed

7  to compensate him for the time he worked.  Even if plaintiff only

8  worked at Stockton Honda for seven months, the fact that he may

9  have been underpaid for a different length of time than other

10  class members does not show that his injuries were atypical of

11  the class.  See, e.g., Monterrubio v. Best Buy Stores, L.P., 291

12  F.R.D. 443, 450 (E.D. Cal. 2013) (England, J.) (holding that

13  named plaintiff satisfied the typicality requirement in spite of

14  "minor factual differences" amongst the size of class members'

15  claims because he was "subject to the same policies and

16  practices" as other class members); Kamar v. Radio Shack Corp.,

17  254 F.R.D. 387, 396 (C.D. Cal. 2008) (noting that variation in

18  "actual hours of work" between class members in a wage-and-hour

19  class action "does not defeat typicality"); see generally Guido

20  v. L'Oreal, USA, Inc., 284 F.R.D. 468, 479 (C.D. Cal. 2012)

21  (emphasizing that, as a general rule, "differences in the amount

22  of damages [are] insufficient to defeat class certification"

23  (citing Stearns v. Ticketmaster Co., 655 F.3d 1013, 1026 (9th

24  Cir. 2011)).

25      Nor is there any indication that plaintiff is subject

26  to unique defenses that threaten his ability to represent the

27  class.  See Hanon, 976 F.2d at 508.  Earlier in the case,

28  defendants argued that plaintiff's claims were barred because he

16

1  had signed an agreement with Stockton Honda to arbitrate his

2  employment-related disputes; however, the previously-assigned

3  district judge concluded that this agreement did not bar

4  plaintiff's claims and defendants have since dismissed their

5  appeal of this determination.  (See Docket Nos. 104, 124.)  At

6  this stage in the litigation, it does not appear that the

7  uniqueness of this defense will overtake plaintiff's ability to

8  assert claims typical of the class.  Accordingly, plaintiff has

9  satisfied the typicality requirement.

10                    d.   Adequacy of Representation

11        Finally, Rule 23(a) requires that "the representative

12  parties will fairly and adequately protect the interests of the

13  class."  Fed. R. Civ. P. 23(a)(4).  "Resolution of two questions

14  determines legal adequacy: (1) do the named plaintiffs and their

15  counsel have any conflicts of interest with other class members

16  and (2) will the named plaintiffs and their counsel prosecute the

17  action vigorously on behalf of the class?"  Hanlon, 150 F.3d at

18  1020.  These inquiries require the court to consider a number of

19  factors, including "the qualifications of counsel for the

20  representatives, an absence of antagonism, a sharing of interests

21  between representatives and absentees, and the unlikelihood that

22  the suit is collusive."  Brown v. Ticor Title Ins. Co., 982 F.2d

23  386, 390 (9th Cir. 1992).

24                    i.   Conflicts of Interest

25        The first portion of the adequacy inquiry focuses on

26  whether plaintiff's interests are aligned with those of a class,

27  and is "especially critical when . . . a class settlement is

28  tendered along with a motion for class certification."  Hanlon,

                                   17

1    150 F.3d at 1020.  In most respects, plaintiff's interests appear

2    to be aligned with those of the class: because the class is

3    defined to include all service technicians who worked at

4    defendant automotive dealerships from March 12, 2004, to the

5    present and specifically excludes exempt supervisors or managers,

6    it is unlikely that plaintiff's interests will conflict with

7    those of the class.  See, e.g., Murillo, 266 F.R.D. at 478

8    (finding that appropriate class definition ensured that "the

9    potential for conflicting interests will remain low like the

10   likelihood of shared interests remains high"); Alberto v. GMRI,

11   Inc., 252 F.R.D. 652, 662 (E.D. Cal. 2008) (same); see generally

12   Windsor, 521 U.S. at 625-26 ("[A] class representative must be

13   part of the class and possess the same interest and suffer the

14   same injury as the class members.").

15        The settlement provides for an incentive award of

16   $20,000 to plaintiff.  (Settlement Agreement § 3, ¶ C.)  Although

17   the Ninth Circuit has specifically approved the award of

18   "reasonable incentive payments" to named plaintiffs, the use of

19   an incentive award nonetheless raises the possibility that

20   plaintiff's interest in receiving that award will cause his

21   interests to diverge from the class's interest in a fair

22   settlement.  Staton, 327 F.3d at 977-78 (declining to approve a

23   settlement agreement where size of incentive award suggested that

24   named plaintiffs were "more concerned with maximizing [their own]

25   incentives than with judging the adequacy of the settlement as it

26   applies to class members at large").  As a result, district

27   courts must "scrutinize carefully the awards so that they do not

28   undermine the adequacy of the class representatives." Radcliffe

1  v. Experian Info. Sys., Inc., 715 F.3d 1157, 1163 (9th Cir.
2  2013).

3         While incentive awards create the risk of a conflict of
4  interest, the incentive award in this case does not appear to do
5  so.  While the aggregate amount of the award is high, it is not
6  so high that it is per se unreasonable.  See, e.g., Van Vranken
7  v. Atl. Richfield Co., 901 F. Supp. 294, 300 (N.D. Cal. 1995)
8  (holding that incentive award of $50,000 to each named plaintiff
9  was fair and reasonable); Glass v. UBS Fin. Servs., Inc., Civ.
10  No. 04-4068 MMC, 2007 WL 221862 (N.D. Cal. Jan. 26, 2007)
11  (approving incentive award of $25,000 for each of four named
12  plaintiffs).

13         Nor is the proposed incentive award grossly
14  disproportionate to the recovery of the other class members.  For
15  instance, numerous judges in this district have disapproved of
16  incentive awards that dwarf the average class member's recovery.
17  See, e.g., Alberto, 252 F.R.D. at 669 (finding $5,000 incentive
18  award unreasonable when average class member would receive
19  $24.17); Monterrubio, 291 F.R.D. at 463 (finding $7,500 incentive
20  award unreasonable when average class member would receive
21  $65.79).  By contrast, plaintiff's proposed incentive award of
22  $20,000 is more closely proportional to the average class
23  member's recovery of $6,000 than others that judges in this
24  district have approved.  See, e.g., Monterrubio, 291 F.R.D. at
25  463 (preliminarily approving incentive award of $2,500 when
26  average class member would receive $65.79).

27         Additionally, plaintiff's incentive award appears
28  justified in light of the time and effort that plaintiff has

19

1   devoted to this case.  Class counsel represent that they have had

2   regular discussions and meetings with plaintiff about the case

3   during the six years since it was filed, that plaintiff actively

4   participated in the investigation of the case, and that plaintiff

5   was involved in mediation and settlement negotiations.  (Mallison

6   Decl. ¶¶ 41-42.)  These are exactly the sort of tasks for which

7   an incentive award is appropriate.  See Rodriguez v. West

8   Publishing Corp., 563 F.3d 948, 958-59 (9th Cir. 2009) (noting

9   that incentive awards "are intended to compensate class

10  representatives for work done on behalf of the class, to make up

11  for financial or reputational risk undertaken in bringing the

12  action, and, sometimes, to recognize their willingness to act as

13  a private attorney general").

14         While the court determines at this stage that a $20,000

15  incentive award does not render plaintiff an inadequate

16  representative of the class, it emphasizes that this is only a

17  preliminary determination.  An incentive award consisting of one

18  percent of the common fund is unusually high, and some courts

19  have been reticent to approve incentive awards that constituted

20  an even smaller portion of the common fund.  See, e.g., Ko v.

21  Natura Pet Prods., Inc., Civ. No. 09-2619 SBA, 2012 WL 3945541,

22  at *15 (N.D. Cal. Sep. 10, 2012) (holding that an incentive award

23  comprising one percent of the common fund was "excessive under

24  the circumstances"); Sandoval v. Tharaldson Emp. Mgmt., Inc.,

25  Civ. No. 08-482 VAP OPx, 2010 WL 2486346, at *10 (C.D. Cal. June

26  15, 2010) (citing cases).  On or before the date of the final

27  Fairness Hearing, the parties should present or be prepared to

28  present evidence of plaintiff's substantial efforts taken as

1  class representative to justify the discrepancy between his award

2  and those of the unnamed class members.

3                    ii.   Vigorous Prosecution

4         The second prong of the adequacy inquiry examines the

5  vigor with which the named plaintiff and his counsel have pursued

6  the class's claims.  "Although there are no fixed standards by

7  which 'vigor' can be assayed, considerations include competency

8  of counsel and, in the context of a settlement-only class, an

9  assessment of the rationale for not pursuing further litigation."

10  Hanlon, 150 F.3d at 1021.

11         Here, class counsel indicate that they have extensive

12  experience litigating wage-and-hour class actions; since starting

13  their firm in 2005, they have litigated over sixty wage-and-hour

14  class actions and have brokered seven-figure settlements in at

15  least five of those cases.  (Mallison Decl. ¶ 6.)  Class counsel

16  also indicate that they reached the decision to settle this case

17  after considerable deliberation, review of over 100,000 pages of

18  discovery, several all-day mediation sessions, and consideration

19  of the risk presented by litigating this action further.  (Id. ¶¶

20  30, 37-40.)  In light of these factors, "the court can safely

21  assume that plaintiff's counsel has vigorously sought to maximize

22  the return on its labor and to vindicate the injuries of the

23  entire class."  Murillo, 266 F.R.D. at 476.  Accordingly, the

24  court determines that plaintiff is an adequate class

25  representative.

26         2.   Rule 23(b)

27         An action that meets all the prerequisites of Rule

28  23(a) may only be certified as a class action if it also

1   satisfies the requirements of one of the three subdivisions of

2   Rule 23(b).  <u>Leyva</u>, 716 F.3d at 512.  Plaintiff seeks

3   certification under Rule 23(b)(3), which provides that a class

4   action may be maintained only if (1) "the court finds that

5   questions of law or fact common to class members predominate over

6   questions affecting only individual members" and (2) "that a

7   class action is superior to other available methods for fairly

8   and efficiently adjudicating the controversy."  Fed. R. Civ. P.

9   23(b)(3).

10              a.   <u>Predominance</u>

11              "Because Rule 23(a)(3) already considers commonality,

12   the focus of the Rule 23(b)(3) predominance inquiry is on the

13   balance between individual and common issues."  <u>Murillo</u>, 266

14   F.R.D. at 476 (citing <u>Hanlon</u>, 150 F.3d at 1022).  Here,

15   plaintiff's allegations implicate the "legality of a common

16   method" for calculating service technician pay, <u>id.</u>, and

17   therefore demonstrate that a "common nucleus of facts and

18   potential legal remedies dominates this litigation."  <u>Hanlon</u>, 150

19   F.3d at 1022.  In particular, the class's claims turn on the

20   questions of whether ZAG-affiliated dealerships paid service

21   technicians on a flat-rate, piece-work basis, whether that

22   payment scheme was unlawful, and whether that policy was in fact

23   common among ZAG dealerships.  <u>See</u> <u>supra</u> II.B.1.b.  Even if these

24   claims were ultimately incorrect on the merits, that fact alone

25   would not undermine a finding of predominance.  <u>See</u> <u>Amgen Inc. v.</u>

26   <u>Conn. Retirement Plans & Trust Funds</u>, 133 S.Ct. 1184, 1191 (2013)

27   ("Rule 23(b)(3) requires a showing that <u>questions</u> common to the

28   class predominate, not that those questions will be answered, on

1   the merits, in favor of the class.").

2          Insofar as individualized issues remain in the
3   litigation, those issues largely relate to the amounts that
4   individual service technicians were allegedly underpaid as a
5   result of the flat-rate system.  Discrepancies in the amount of
6   underpayment are damages questions that do not undermine a
7   finding of predominance.  See, e.g., Ortega v. J.B. Hunt Transp.,
8   Inc., 258 F.R.D. 361, 372 (C.D. Cal. 2009) (concluding that
9   discrepancies in compensation under piece rate system did not
10  undermine predominance when liability could be assessed on a
11  class-wide basis); Kamar, 254 F.R.D. at 404 (finding that
12  discrepancy in hours worked between class members "bears not on
13  the predominance of common questions of liability, but on the
14  amount of damages").

15         To the extent that any further individual issues may
16  exist, there is no indication that those issues would be anything
17  more than "local variants of a generally homogenous collection of
18  causes" that derive from the named plaintiff's allegations.
19  Hanlon, 150 F.3d at 1022.  These idiosyncratic differences are
20  therefore "not sufficiently substantive to predominate over the
21  shared claims."  Id. at 1022-23.

22                    b.   Superiority

23         In addition to the predominance requirement, Rule
24  23(b)(3) permits class certification only upon a showing that "a
25  class action is superior to other available methods for fairly
26  and efficiently adjudicating the controversy."  Fed. R. Civ. P.
27  23(b)(3).  It sets forth four non-exhaustive factors that courts
28  should consider in making this determination:

23

1       (A) the class members' interests in individually
2   controlling the prosecution or defense of separate
    actions;

3       (B) the extent and nature of any litigation concerning
4   the controversy already begun by or against class
    members;

5       (C) the desirability or undesirability of
6   concentrating the litigation of the claims in the
    particular forum; and

7       (D) the likely difficulties in managing a class
    action.

8

9   <u>Id.</u> "Some of these factors, namely (D) and perhaps (C), are

10  irrelevant if the parties have agreed to a pre-certification

11  settlement." <u>Murillo</u>, 266 F.R.D. at 477 (citing <u>Windsor</u>, 521

12  U.S. at 620).

13      Here, the court is unaware of any concurrent litigation

14  regarding the issues in this case.[4] Given that no class member

15  has initiated any competing action in the six years since this

16  case was filed, it is also unlikely that other individual class

17  members have an interest in controlling the prosecution of this

18  action or related actions--although objectors at the fairness

19  hearing may reveal otherwise. In light of those factors, the

20  class action appears at this stage to be the superior method for

21  adjudicating this controversy.

22      c. <u>Rule 23(c)(2) Notice Requirements</u>

23      If the court certifies a class under Rule 23(b)(3), it

---

24      [4] In 2010, the previously-assigned judge stayed this
25  action pending the resolution of a state-court lawsuit between
    defendants and their liability carrier regarding insurance
26  coverage of the claims in this dispute. That lawsuit has since
    been resolved. Even if it were ongoing, it would not bear upon
27  the superiority of class treatment because it does not involve
    claims "by or against members of the class." Fed. R. Civ. P.
28  23(b)(3)(B).

1  "must direct to class members the best notice that is practicable

2  under the circumstances, including individual notice to all

3  members who can be identified through reasonable effort." Fed.

4  R. Civ. P. 23(c)(2)(B).  Rule 23(c)(2) governs both the form and

5  content of a proposed notice.  See Ravens v. Iftikar, 174 F.R.D.

6  651, 658 (N.D. Cal. 1997) (citing Eisen v. Carlisle & Jacquelin,

7  417 U.S. 156, 172-77 (1974)).  Although that notice must be

8  "reasonably certain to inform the absent members of the plaintiff

9  class," actual notice is not required.  Silber v. Mabon, 18 F.3d

10 1449, 1454 (9th Cir. 1994) (citation omitted).

11          Here, the Settlement Agreement provides that the

12 Settlement Administrator, Simpluris, will mail notice of the

13 settlement to the last known address of all class members.

14 (Settlement Agreement § III, ¶ G.2.)  The Agreement also provides

15 that Simpluris will use its best efforts to locate updated

16 addresses for class members in the event that any class notice is

17 returned as undeliverable.  (Id.)  The court is satisfied that

18 this system of providing notice is reasonably calculated to

19 provide notice to class members and is the best form of notice

20 available under the circumstances.  See Monterrubio, 291 F.R.D.

21 at 443 (approving settlement in which Simpluris provided notice

22 by mail to potential class members).

23          Likewise, the notice itself clearly identifies the

24 options available to putative class members--do nothing, object,

25 or opt out--and comprehensively explains the nature and mechanics

26 of the settlement in a separate document.  (See Mallison Decl.

27 Ex. 2 (Docket No. 123-4).)  The content of the notice is

28 therefore sufficient to satisfy Rule 23(c)(2)(B).  See Churchill

1  Vill., L.L.C. v. Gen. Elec., 361 F.3d 566, 575 (9th Cir. 2004)

2  ("Notice is satisfactory if it 'generally describes the terms of

3  the settlement in sufficient detail to alert those with adverse

4  viewpoints to investigate and to come forward and be heard.'"

5  (quoting Mendoza v. Tucson Sch. Dist. No. 1., 623 F.2d 1338, 1352

6  (9th Cir. 1980)).

7       C.   Preliminary Settlement Approval

8          Having determined that the proposed class satisfies the

9  requirements of Rule 23, the court must determine whether the

10  terms of the parties' settlement appear fair, adequate, and

11  reasonable.[5]  Fed. R. Civ. P. 23(e)(2); Hanlon, 150 F.3d at 1026.

12  In order to approve a final class-action settlement, the court

13  must "balance a number of factors," including:

14       the strength of the plaintiff's case; the risk,
         expense, complexity, and likely duration of further
15       litigation; the risk of maintaining class action
         status throughout the trial; the amount offered in
16       settlement; the extent of discovery completed and the
         stage of the proceedings; the experience and views of
17       counsel; the presence of a governmental participant;
         and the reaction of the class members to the proposed
18       settlement.

19  Hanlon, 150 F.3d at 1026.

20          Because many of these factors cannot be considered

21  until the final Fairness Hearing, the court need only conduct a

22  preliminary review so as to resolve any "glaring deficiencies" in

23  _____

24          [5]    Because the proposed notice satisfies the more
     stringent requirements of Rule 23(c)(2)(B), the court concludes
25   that it also meets the requirements of Rule 23(e), which provides
     that "[t]he court must direct notice in a reasonable manner to
26   all class members who would be bound by the proposal."  Fed. R.
     Civ. P. 23(e)(1); see also Wright v. Linkus Enters., Inc., 259
27   F.R.D. 468, 475 (E.D. Cal. 2009) (England, J.) (finding that
     notice satisfying Rule 23(c)(2)(B) also satisfied Rule 23(e)(1)).
28

1    the Settlement Agreement before authorizing notice to class

2    members.  <u>Murillo</u>, 266 F.R.D. at 478.  In other words, if:

> the proposed settlement appears to be the product of
> serious, informed, non-collusive negotiations, has no
> obvious deficiencies, does not improperly grant
> preferential treatment to class representatives or
> segments of the class, and falls within the range of
> possible approval, the court should direct that the
> notice be given to the class members of a formal
> fairness hearing.

8    <u>In re Tableware Antitrust Litig.</u>, 484 F. Supp. 2d 1078, 1079

9    (N.D. Cal. 2007) (citations and internal quotation marks

10   omitted).

11                1.   <u>Terms of Settlement Agreement</u>

12               The key terms of the Settlement Agreement are as

13   follows:

14        (1) **Settlement Class**: All nonexempt automotive technicians

15   employed by one or more defendants at any time between March 12,

16   2004, and the date of preliminary approval.  (Settlement

17   Agreement § I, ¶ C.)

18        (2) **Notice**: Defendants will provide the Settlement

19   Administrator with the address and contact information of each

20   class member within ten days of the date of preliminary approval.

21   The Settlement Administrator will send a packet containing a

22   class notice, share and correction form, and opt-out form to all

23   class members within five days of receiving the class members'

24   addresses and contact information.  In the event that a class

25   notice packet is returned as undeliverable, the Settlement

26   Administrator will work with class counsel and defendants'

27   counsel to find a more current address and will re-send the

28   packet to that address.  (<u>Id.</u> § III, ¶ G.2.)

(3) **Opt-Out Procedure:** To opt out of the settlement, a class member must submit and sign an opt-out form and mail that form to the Settlement Administrator no later than forty-five days after the Settlement Administrator mails the class notice packet.  A class member who does not do so will automatically become part of the settlement class and will be bound by all terms and conditions of the Settlement Agreement, including release of claims, if the court approves the Settlement Agreement at the final Fairness Hearing.  (<u>Id.</u> § III, ¶ G.4.b.)

(4) **Objections to Settlement:** Any individual class member may object to or comment on the settlement so long as he or she files and serves a copy of the comment or objection no later than sixty days after the court grants preliminary approval.  Any objection not filed by that deadline shall be deemed waived. (<u>Id.</u> § III, ¶ G.4.a.)

(5) **Settlement Amount:** Defendants have agreed to pay a gross settlement amount of $2,000,000.  That amount shall be used to satisfy the claims of all participating settlement members, class counsel's litigation expenses, any award of attorney's fees to class counsel, an incentive award to plaintiff, a payment to the state of California in satisfaction of plaintiff's Private Attorney General Act claim, payroll taxes on the portion of the settlement fund designated as wages, and claims administration expenses.  The total amount paid to class members will depend upon the number of class members who opt out and the amount of fees and expenses as determined by the court at the final Fairness Hearing.  (<u>Id.</u> § III, ¶¶ B-C.)

(6) **Attorney's Fees and Incentive Award:** Plaintiff and class

28

1  counsel will apply for an attorney's fee award of no more than

2  33.3% of the settlement fund, expenses and costs of $50,000, and

3  an incentive award of no more than $20,000.  Defendants agree not

4  to oppose these requests.  (Id. § III, ¶ C.)

5       (7)  **Settlement Distribution:** Settlement funds will be

6  distributed on an individualized basis using a formula created by

7  the parties.  That formula will pay each class member a share of

8  the settlement fund equivalent to the number of weeks that

9  individual worked during the class period divided by the number

10 of weeks worked by all class members over that period.  One third

11 of each class member's recovery is intended to settle claims for

12 lost wages, and that portion of the recovery shall be subject to

13 tax withholding.  Class members shall be paid by check.  After

14 sixty days, any un-cashed checks will be cancelled and the

15 remaining sum available will be distributed to those class

16 members who did cash their checks.  In the event that any class

17 members fail to cash checks issued in the second round, those

18 funds will be distributed to designated cy pres beneficiaries.

19 (Id. § III, ¶ E.)

20      (8) **Release:**  Class members will agree to release "any and

21 all claims, debts, liabilities, guarantees, costs, expenses,

22 attorney's fees, damages, actions, or causes of action set forth

23 in the Second Amended Complaint."  The release excludes "all

24 other claims, including but not limited to retaliation,

25 discrimination, unemployment, disability, and workers'

26 compensation."  In addition, plaintiff agrees to execute a

27 general release of all claims against defendants and to waive any

28 rights he may retain against defendants under section 1542 of the

1  California Civil Code.  Defendants agree to execute a

2  corresponding general release of any claims against plaintiff and

3  to dismiss their pending appeal to the Ninth Circuit.  (Id. §

4  III, ¶ H.)

5              2.   Preliminary Determination of Adequacy

6          A settlement agreement is most likely to be fair and

7  adequate when it appears to be the product of informed, vigorous,

8  arms-length bargaining.  See Tableware, 484 F. Supp. 2d at 1080

9  (holding that this factor militates in favor of settlement

10  approval).  Class counsel indicate that their firm reviewed over

11  142,700 pages of documents and engaged in "numerous all day

12  mediations" with defendants before reaching a settlement.

13  (Mallison Decl. ¶¶ 27-30.)  According to class counsel, the

14  parties' decision to settle the case reflected not only the time

15  and expense that both sides would incur in the course of further

16  litigation, but the uncertainty posed by defendants' pending

17  appeal before the Ninth Circuit, the risk that the California

18  Supreme Court would grant review in several recent wage-and-hour

19  cases on which plaintiff relies, and the prospect that this court

20  may not certify a class for trial.  (Id. ¶¶ 39-40.)  In light of

21  these considerations, the court will not second-guess counsel's

22  determination that the settlement is in the best interest of the

23  class.  See Fraley v. Facebook, Inc., 966 F. Supp. 2d 939, 942

24  (N.D. Cal. 2013) (holding that a settlement reached after

25  informed negotiations "is entitled to a degree of deference as

26  the private consensual decision of the parties" (citing Hanlon,

27  150 F.3d at 1027)).

28          In determining whether a settlement agreement is

1  substantively fair to the class, a court must balance the value

2  of plaintiffs' expected recovery against the value of the

3  settlement offer.  Tableware, 484 F. Supp. 2d at 1080.  The

4  settlement provides for an average recovery of approximately

5  $6,000, a generous amount in a case of this nature.  See, e.g.,

6  Vasquez v. Coast Valley Roofing, Inc., 670 F. Supp. 2d 1114, 1125

7  (E.D. Cal. 2009) (Wanger, J.) (approving wage-and-hour settlement

8  providing for an average recovery of $1,000); Barbosa v. Cargill

9  Meat Solutions Corp., 297 F.R.D. 431, 440 (E.D. Cal. 2013)

10  (Oberto, M.J.) (approving wage-and-hour settlement providing for

11  an average recovery of $601.91).  The value of the recovery is

12  especially significant in light of the "significant amount of

13  uncertainty" class members would face if the case were litigated

14  to trial.  Murillo, 266 F.R.D. at 480.  The court therefore

15  concludes that the substance of the settlement is fair to class

16  members and thereby "falls within the range of possible

17  approval."  Tableware, 484 F. Supp. 2d at 1079.

18       Finally, the settlement has no "obvious deficiencies,"

19  id., that militate against preliminary approval.  Simpluris, the

20  settlement administrator, is an experienced claims administrator

21  who has been appointed by several other judges of this district.

22  See, e.g., Monterrubio, 291 F.R.D. at 443; Adoma v. Univ. of

23  Phoenix, Inc., 913 F. Supp. 2d 964, 971-72 (E.D. Cal. 2012)

24  (Karlton, J.).  Class counsel indicates that Simpluris's expected

25  fees are $9,700 and that it has agreed to cap its fee at $15,000.

26  Those fees are consistent with those awarded by other judges of

27  this district in similar cases.  See, e.g., Adoma, 913 F. Supp.

28  2d at 985 (approving a $19,000 fee for Simpluris); Vasquez, 266

1   F.R.D. at 484 (approving a $25,000 fee for the settlement

2   administrator).  Likewise, class counsel's claimed expenses and

3   costs of $50,000 do not appear unreasonable at this stage in the

4   litigation.  See, e.g., Hartless v. Clorox Co., 273 F.R.D. 630,

5   646 (S.D. Cal. 2011) (awarding $111,002.22 in costs); Loretz v.

6   Regal Stone, Ltd., 756 F. Supp. 2d 1203, 1218 (N.D. Cal. 2010)

7   (awarding a total of over $70,000 in costs to two law firms

8   acting as class counsel).

9        For reasons discussed elsewhere in this Order, the

10  amount of the attorney's fee award, see infra II.C.3, and the

11  amount of plaintiff's incentive award, see supra II.B.1.d.i, do

12  give the court pause.  Nonetheless, the court cannot conclude at

13  this stage that either award is excessive, let alone so grossly

14  excessive that it imperils the fairness or adequacy of this

15  settlement.  Cf. Murillo, 266 F.R.D. at 480 (preliminarily

16  approving settlement in spite of concerns that attorney's fee

17  award was excessive).  Accordingly, because the settlement

18  appears "fair, reasonable, and adequate," Fed. R. Civ. P.

19  23(e)(2), the court will preliminarily approve the settlement

20  agreement pending a final Fairness Hearing.

21            3.   Attorney's Fees

22        If a negotiated class action settlement includes an

23  award of attorney's fees, that fee award must be evaluated in the

24  overall context of the settlement.  Knisley v. Network Assocs.,

25  312 F.3d 1123, 1126 (9th Cir. 2002); Monterrubio, 291 F.R.D. at

26  455.  The court "ha[s] an independent obligation to ensure that

27  the award, like the settlement itself, is reasonable, even if the

28  parties have already agreed to an amount."  In re Bluetooth

1    Headset Prods. Liab. Litig., 654 F.3d 935, 941 (9th Cir. 2011).

2            The Ninth Circuit has approved two methods of assigning

3    attorney's fees in common fund cases: the "percentage of the

4    fund" method and the "lodestar" method.  Vizcaino v. Microsoft

5    Corp., 290 F.3d 1043, 1047 (9th Cir. 2002) (citing In re Wash.

6    Pub. Power Supply Sys. Litig., 19 F.3d 1291, 1295-96 (9th Cir.

7    1994)).  Under the percentage method, the court may award class

8    counsel a percentage of the common fund recovered for the class.

9    Id.  The percentage method is particularly appropriate in common

10   fund cases, where "the benefit to the class is easily

11   quantified."  Bluetooth, 654 F.3d at 942.  The Ninth Circuit has

12   approved a "benchmark" percentage of twenty-five percent, and

13   courts may adjust this figure upwards or downwards if the record

14   shows "'special circumstances' justifying a departure."  Id.

15   (quoting Six (6) Mexican Workers v. Ariz. Citrus Growers, 904

16   F.2d 1301, 1311 (9th Cir. 1990)).

17           Under the lodestar method, the court determines an

18   appropriate attorney's fee by multiplying the number of hours

19   reasonably expended by class counsel by a reasonable hourly rate.

20   Id. at 941.  The court may then adjust the lodestar upwards or

21   downwards based on a "host of 'reasonableness' factors."  Id. at

22   942 (citing Hanlon, 150 F.3d at 1029).  While the lodestar method

23   is most often applied in class actions brought under fee-shifting

24   statutes or those where the relief obtained is not easily

25   monetized, it may be used in common fund cases as well.  Id. at

26   941-42.  In addition, the lodestar method may be used to "cross-

27   check" the reasonableness of a percentage award.  Vizcaino, 290

28   F.3d at 1050-51.

1          Here, class counsel request a percentage award of 33.3%

2     of the common fund.  While some courts have approved percentage

3     awards as high as 33.3%, awards of that size are typically

4     disfavored unless they are corroborated by the lodestar or

5     reflect exceptional circumstances.  See, e.g., Adoma, 913 F.

6     Supp. 2d at 982-83 (rejecting class counsel's argument that a

7     33.3% award was appropriate and distinguishing cases);

8     Monterrubio, 291 F.R.D. at 457-58 (same).  Class counsel has not

9     submitted any records of the time spent on this litigation to

10    support their claim that a 33.3% award is appropriate.  And while

11    the court has no doubts about class counsel's competence or the

12    vigor with which they have prosecuted this matter, it is unable

13    to conclude at this stage in the litigation that the results

14    class counsel obtained were sufficiently exceptional to merit a

15    33.3% award.

16         In spite of these reservations, the court need not

17    reduce the fee award at this point in the case.  See Murillo, 266

18    F.R.D. at 480 (granting preliminary approval of the settlement

19    despite concerns that the proposed attorney's fee award was

20    unreasonable).  Instead, the court preliminarily approves the fee

21    award on the understanding that class counsel must demonstrate,

22    on or before the date of the final Fairness Hearing, that the

23    proposed award is reasonable in light of the hours expended and

24    the circumstances of the case.  In the event that class counsel

25    is unable to do so, the court would then be forced to reduce

26    class counsel's fees to a reasonable amount or to deny final

27    approval of this settlement.  See Vizcaino, 290 F.3d at 1047;

28    Alberto, 252 F.R.D. at 667-68.

1        IT IS THEREFORE ORDERED that plaintiff's motion for

2   preliminary certification of a conditional settlement class and

3   preliminary approval of the class action settlement be, and the

4   same hereby is, GRANTED.

5        IT IS FURTHER ORDERED THAT:

6        (1) the following class be provisionally certified for the

7   purpose of settlement: all nonexempt automotive technicians who

8   have been employed by one or more defendants at any time between

9   March 12, 2004, through the date on which this Order is signed.

10  In the event that the proposed settlement is not consummated for

11  any reason, the conditional certification shall be of no further

12  force or effect and shall be vacated without further action or

13  order of this court;

14       (2) the proposed settlement is preliminarily approved as

15  fair, just, reasonable, and adequate to the members of the

16  settlement class, subject to further consideration at the final

17  Fairness Hearing after distribution of notice to members of the

18  settlement class;

19       (3) for purposes of carrying out the terms of the settlement

20  only:

21       (a) plaintiff Jose Ontiveros is appointed as the

22  representative of the settlement class and is provisionally found

23  to be an adequate representative within the meaning of Rule 23;

24       (b) the law firm of Mallison & Martinez is

25  provisionally found to be a fair and adequate representative of

26  the settlement class and is appointed as class counsel for the

27  purposes of representing the settlement class conditionally

28  certified in this Order;

                                35

1    (4) Simpluris, Inc. is appointed as the settlement

2    administrator;

3    (5) the form and content of the proposed Notice of Class

4    Action Settlement and Final Approval Hearing, Share and

5    Correction form, and Request for Exclusion are approved, except

6    to the extent that those forms reflect dates modified by this

7    Order;

8    (6) no later than ten (10) days from the date this Order is

9    signed, defendants' counsel shall provide the names and contact

10   information of all settlement class members to Simpluris;

11   (7) no later than fifteen (15) days from the date this Order

12   is signed, Simpluris shall mail a Notice of Class Action

13   Settlement and Final Approval Hearing, a Share and Correction

14   form, and a Request for Exclusion form to all members of the

15   settlement class;

16   (8) no later than sixty (60) days from the date this Order

17   is signed, any member of the settlement class who intends to

18   object to, comment upon, or opt out of the settlement shall mail

19   written notice of that intent to Simpluris pursuant to the

20   instructions in the Notice of Class Action Settlement and Final

21   Approval Hearing;

22   (9) a final Fairness Hearing shall be held before this court

23   on Monday, October 6, 2014, at 2:00 p.m. in Courtroom 5 to

24   determine whether the proposed settlement is fair, reasonable,

25   and adequate and should be approved by this court; to determine

26   whether the settlement class's claims should be dismissed with

27   prejudice and judgment entered upon final approval of the

28   settlement; to determine whether final class certification is

36

appropriate; and to consider class counsel's applications for
attorney's fees, costs, and an incentive award to plaintiff.  The
court may continue the final Fairness Hearing without further
notice to the members of the class;

(10) no later than twenty-eight (28) days before the final
Fairness Hearing, class counsel shall file with this court a
petition for an award of attorney's fees and costs.  Any
objections or responses to the petition shall be filed no later
than fourteen (14) days before the final Fairness Hearing.  Class
counsel may file a reply to any objections no later than seven
(7) days before the final Fairness Hearing;

(11) no later than twenty-eight (28) days before the final
Fairness Hearing, class counsel shall file and serve upon the
court and defendants' counsel all papers in support of the
settlement, the incentive award for the class representative, and
any award for attorney's fees and costs;

(12) no later than twenty-eight (28) days before the final
Fairness Hearing, Simpluris shall prepare, and class counsel
shall file and serve upon the court and defendants' counsel, a
declaration setting forth the services rendered, proof of
mailing, a list of all class members who have opted out of the
settlement, a list of all class members who have commented upon
or objected to the settlement, and copies of any Share and
Correction forms and/or Notice of Exclusion forms received;

(13) any person who has standing to object to the terms of
the proposed settlement may appear at the final Fairness Hearing
in person or by counsel and be heard to the extent allowed by the
court in support of, or in opposition to, (a) the fairness,

37

1   reasonableness, and adequacy of the proposed settlement, (b) the

2   requested award of attorney's fees, reimbursement of costs, and

3   incentive award to the class representative, and/or (c) the

4   propriety of class certification.  To be heard in opposition at

5   the final Fairness hearing, a person must, no later than sixty

6   (60) days from the date this Order is signed, (a) serve by hand

7   or through the mails written notice of his or her intention to

8   appear, stating the name and case number of this action and each

9   objection and the basis therefore, together with copies of any

10  papers and briefs, upon class counsel and counsel for defendants,

11  and (b) file said appearance, objections, papers, and briefs with

12  the court, together with proof of service of all such documents

13  upon counsel for the parties.  Responses to any such objections

14  shall be served by hand or through the mails on the objectors, or

15  on the objector's counsel if any there be, and filed with the

16  court no later than fourteen (14) calendar days before the final

17  Fairness Hearing.  Objectors may file optional replies no later

18  than seven (7) calendar days before the final Fairness Hearing in

19  the same manner described above.  Any settlement class member who

20  does not make his or her objection in the manner provided herein

21  shall be deemed to have waived such objection and shall forever

22  be foreclosed from objecting to the fairness or adequacy of the

23  proposed settlement, the judgment entered, and the award of

24  attorney's fees, costs, and an incentive award to the class

25  representative unless otherwise ordered by the court.

26  Dated:  July 7, 2014

27

28

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE